### CALEDONIA COAL CO. *v.* CONSOLIDATED COAL CO.

1. CONTRACTS—MINES AND MINERALS—COAL MINE—INTERPRETATION —MINING RATES.

Where the defendant purchased plaintiff's output of coal for a price stated, and it was stipulated as a part of the contract that "the prices named in this contract are based on the present Michigan mining rates of $1.01 per ton, and shall be increased or reduced on all sizes of coal as said mining rate may advance or decline," and the rate of doing the actual mining increased five cents a ton, the price of such output advanced five cents per ton under the agreement, and plaintiff was not entitled to demand an increase of *upwards* of five per cent. because other mine work advanced in cost to about that extent.

2. SAME—MINES.

It is an elementary rule of construction of contracts that all language used should be recognized and given a meaning where it is possible.

Error to Saginaw; Gage, J. Submitted April 24, 1914. (Docket No. 124.) Decided July 24, 1914.

Assumpsit by the Caledonia Coal Company against the Consolidated Coal Company for goods sold and delivered. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Snow & Snow*, for appellant.

*Humphrey, Grant & Humphrey*, for appellee.

STEERE, J. This action was brought to recover a balance which plaintiff claims due it from defendant under a written contract entered into between the parties on July 22, 1910, whereby plaintiff, the Caledonia Coal Company, sold the defendant, the Consolidated Coal Company, the output of a mine plaintiff was then opening.

The controversy arises over the construction of that portion of said contract relating to the price per ton to be paid for the coal after a certain date; there being no disagreement as to the amount mined and delivered or the payments made, which, under defendant's interpretation of the agreement, would be in full.

From a judgment on directed verdict for defendant, following the trial court's construction of the clause in dispute, plaintiff brings the proceedings here for review upon a writ of error, contending that a proper construction of the contract either required a directed verdict in its favor or, if not, that the technical trade meaning of certain terms used in the agreement should have been submitted to the jury,

under proper instructions, to be determined from the testimony.

At the time the contract was entered into defendant was itself engaged in operating coal mines and dealing in coal in the Saginaw valley coal mining district, and plaintiff was equipping and developing a mine in the same territory. By an arrangement then made defendant loaned plaintiff money to complete the development and equipment of its mine, agreeing in that connection to purchase, and plaintiff agreeing to sell, the output therefrom until said mine was exhausted. A lengthy contract was then entered into, going into the subject in detail, and containing numerous provisions regarding which no questions have arisen, and which are not material here.

The parties operated under this agreement harmoniously until a general increase in the mining rates per ton in that district brought in question the meaning of paragraph 9 of said contract, which provides:

"The prices named in this contract are based on the present Michigan mining rates of $1.01 per ton, and shall be increased or reduced on all sizes of coal as said mining rate may advance or decline, during the life of this contract."

At the date of the contract an agreement between the coal operators and miners' union fixed the prices paid by the operators for various kinds and classes of work in and about the coal mines in getting out coal. This remained in force until March 31, 1912, when a new agreement increasing the prices was made for the ensuing two years.

The agreement of 1910-12, which was in force at the time the contract between these parties was entered into, fixed the pick-mining scale "for 30 inches of coal and upwards" at $1.01 per ton, the basis adopted between the parties as appears in paragraph 9. There could be no misunderstanding so long as

this rate was in force. When a new agreement was entered into between the operators and the union for the years 1912-14, and prices increased, the item of pick-mining scale "for 30 inches of coal and upwards" was fixed at $1.06 per ton. Defendants construed this as an increased price of 5 cents per ton on all sizes of coal, and made payment accordingly. Plaintiff construed the new agreement of 1912-14 as increasing the cost per ton 5.26 per cent., and brought this action to recover the difference withheld.

This contention arises from the fact that the agreements between operators and miners cover various items for different kinds of service connected with operating a mine, listed under headings fixing the prices therefor, such as "pick-miner's scale," with "three different rates per ton according to the thickness of the veins," "pushing, entry, and narrow work," covering eight different rates according to the work done, "dead work scale," with a provision for additional price under varying conditions, "inside day wage scale," including fourteen items for different classes of work, "outside day wage scale," including eight different items according to the nature of employment, "general machine mining scale," covering six items, and "punch machine scale." Estimated on these numerous items of varying prices for different kinds of work, it is claimed by plaintiff that wages for mining coal were increased a percentage of 5.26, and that under the contract defendant is bound to pay such percentage of increase.

In support of this contention, plaintiff introduced in evidence three books or circulars, two of similar form, called the "Michigan mining scale," being the agreements between operators and miners for 1910-12 and 1912-14, and one called the "Cleveland agreement" for 1912-14. It is claimed and not disputed that the Cleveland agreement was adopted as a basis

for the Michigan agreement of 1912-14.   The Cleveland agreement provides as to pick mining:

"That the price of mining be increased five cents per ton on inch and a quarter screened lump coal, pick mining, in Western Pennsylvania thin vein, the Hocking and basis district of Ohio, and both block and bituminous districts of Indiana; and three cents per ton on mine run coal, pick mining, in the bituminous district of Indiana and Illinois."

An increase of 5.26 per cent. is provided for certain other inside and outside work, which is stated to be a "proportionate advance with the pick-mining rate;" what the previous pick-mining rate was is not shown.   The advance in the pick-mining rate in the Michigan scale is shown to be less than 5 per cent., although other rates appear to have been advanced approximately 5.26 per cent.   The items of "pick-mining scale" in the two Michigan agreements show the percentage of increase as follows:

|  | Per Ton 1910-12. | Per Ton 1912-14. | Increase. |
|---|---|---|---|
| For 30 in. of coal and upwards | $1.01 | $1.06 | 4.95% |
| For 27 in. of coal and less than 30 in. | 1.06 | 1.11 | 4.71% |
| For 24 in. of coal and less than 27 in. | 1.11 | 1.16 | 4.50% |

The rate "of $1.01 per ton," stated in said paragraph 9, here in controversy, necessarily referred to the item "for 30 inches of coal and upwards" at $1.01 per ton in the 1910-12 agreement, increased to $1.06 by the 1912-14 agreement.   No other similar items and figures are found.   The witnesses on both sides practically agree, and it is not questioned, that "the Michigan mining rates [rate] of $1.01 per ton" means the price paid the pick miner for mining a ton of screened coal in a vein 30 inches thick and upwards.

The Michigan mining agreement for 1912-14, cre-

ating the increase in dispute, recites that the Cleveland agreement "was later indorsed by a referendum vote of our entire membership." Nothing is otherwise said about screened coal in the Michigan agreement, as shown by this record; but plaintiff concedes the three Michigan items of pick-mining scale contemplate only screened coal. If the Cleveland agreement governs, that means "inch and a quarter screened lump coal."

The prices mentioned in said paragraph 9, as based on a then rate of $1.01 per ton, are stated in paragraph 4 of said contract as follows:

"For all steam lump coal from a 7-8 inch screen delivered under this contract, second party agrees to pay first party therefor $2.25 per ton, and for all nut, pea, and slack coal so delivered, second party agrees to pay therefor to first party $1.25 per ton."

It follows from this that plaintiff was entitled to the increased rate per ton, whatever the same might be, on all coal it produced, including nut, pea, and slack coal, though its scale to pick miners only provided payment for "inch and a quarter screened lump coal."

Plaintiff urges that "Michigan mining rates" is an expression not generally understood by those not in the coal business—"a technical term, and its meaning and construction is to be ascertained from its technical and trade meaning," which, as a question of fact, should have been submitted to and determined by the jury. In support of this claim, plaintiff's bookkeeper testified that "mining rates" embraced "all labor in the way of producing coal;" and Frank Ardern, an experienced miner and member of the plaintiff company, testified that "mining rates" are the prices contained in the mining scale, and pick mining would be one of the rates in such scale. Interrogated on cross-examination as to how the miners commonly spoke of it, he was asked and answered:

"*Q*. Do they call that the scale or the rates?
"*A*. They call it anything they please.
"*Q*. There is no common way, then?
"*A*. No, sir.
"*Q*. Any common usage?
"*A*. It is a scale, they call it.
"*Q*. That is, the scale without regard to the rates, there is no common use?
"*A*. No, sir; among the miners they call it what they please. There is no common way. It is a scale, they can call it."

It could well be questioned if plaintiff's evidence raised any issue as to whether the term had a technical trade meaning not generally understood. Rate means generally the price or value, a fixed measure of valuation, in this instance definitely stated. Conceding such valuation was according to and part of the Michigan scale, its relation as a scale was with and under the heading "pick-mining scale" per ton; the prices being apportioned in three items according to the thickness of the vein. The rate per ton paid the pick miners is something definite and tangible. It is shown to be, when once agreed upon, the basis from which other rates, or figures, or scales are made at the meetings or conventions of operators and miners when working out their agreements. Mining the coal is the chief work in a coal mine. The other incidental items of expense per ton in mining coal are varying, uncertain, and difficult to estimate in advance.

Manifestly it was for such reason that paragraph 9 of this contract, covering an indefinite term of years in duration, was framed in relation to one definitely stated sum as a basis. This basic item was selected from the Michigan rates then fixing the price per ton paid pick miners, to designate which "there is no common way" or usage, but which the miners "call anything they please." It is distinctly stated that the prices paid per ton for coal under said contract are based on that one definite amount then paid pick min-

ers per ton for mining it, future changes in price, if any, to go up or down "as said mining rate [of $1.01 per ton] may advance or decline during the life of this contract." To give clause 9 the construction contended for by plaintiff necessitates elimination of this distinctly stated and agreed basis "of $1.01 per ton."

It is an elementary rule of construction that all language used should be recognized and given a meaning where possible. We think the trial court properly observed that rule and correctly construed said clause as plainly meaning that the stated rate, or wage, per ton for mining coal 30 inches thick was the agreed, fixed basis of increase or decrease of price per ton which defendant should pay then, and as it might be varied in the future, irrespective of percentages on other items connected with the cost of mining.

Defendant having paid the increased price according to such construction, a verdict of no cause of action was properly directed.

The judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OS-TRANDER, BIRD, and MOORE, JJ., concurred.